OPINION
{¶ 1} The State appeals pursuant to Crim.R. 12(K) from the decision of the trial court to suppress drugs found on defendant Richard Smith.
 {¶ 2} The facts underlying this appeal are set out in Smith's brief and are not in dispute.
 {¶ 3} On May 30, 2003, at approximately 1:20 p.m., two Fiver Rivers Metro Parks rangers were in uniform and on bike patrol in Deeds Metro Park. They observed an individual, later identified as the defendant Richard R. Smith, Jr., sitting on a picnic table in an area known to law enforcement to have high incidences of criminal offenses such as soliciting sex for money and public indecency.
 {¶ 4} The officers circled around and approached Mr. Smith from behind through a hole in the fence. Officer Jason Kramer testified that Mr. Smith appeared nervous and surprised to see the officers. Upon a request from the officers, Smith identified himself as Richard R. Smith and provided a date of birth and a Social Security number, but said he had no identification. Officer Adrian Sargent continued to talk to Smith while Officer Kramer radioed to a cruiser that had both a KDT and the Dayton Police Department's printed-out capias list.
 {¶ 5} The information came back that there was no warrant for a Richard R. Smith with that particular Social Security number and date of birth, but there was a warrant for an individual by that name with a date of birth one year different from the information given by Smith. Officer Kramer continued to talk to the defendant who seemed unclear on his age and a date of birth. The officer believed that Smith was not being truthful and was attempting to hide some information and told Smith that he was not under arrest but he was going to be transported to the county jail to be fingerprinted and his identity determined. Officer Kramer then called for a backup cruiser.
 {¶ 6} At about the same time the cruiser arrived, the defendant produced a state identification card which had another Social Security number and date of birth. Upon checking this new identification information, it was determined that the defendant did have warrants for his arrest. Smith was arrested, handcuffed and searched; suspected
 {¶ 7} drugs were found. After Smith was indicted for drug possession, he moved to suppress the evidence of his crime which the trial court sustained upon the authority of State v. Ford
(2002), 149 Ohio App.3d 676.
 {¶ 8} The State argues that the trial court's suppression of the evidence was improper because the outstanding warrant authorized the officers to stop and seize defendant, notwithstanding that the officers were unaware of the existence of the warrant until after defendant had been effectively seized. Since defendant was legally detained, the State argues the discovery of defendant's identity during the detention was not the product of an unlawful stop or seizure.
 {¶ 9} The State argues that Smith's diminished expectation of privacy as a result of the capias warrant validated his unreasonable stop notwithstanding the discovery of the warrant after the unlawful stop. Citing, Dayton v. Click (October 5, 1994), Montgomery App. No. 14328.
 {¶ 10} In State vs. Taylor (1995), 106 Ohio App.3d 741, we held that an officer's request to look in an airline passenger's carry-on luggage was a consensual encounter. Judge Young summarized the three categories of police-citizen contact identified by the United States Supreme Court:
 {¶ 11} "The first type is a consensual encounter. Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away. The request to examine one's identification does not make an encounter nonconsensual. Nor does the request to search a person's belongings. The Fourth Amendment guarantees are not implicated in such an encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter. Once a person's liberty has been restrained the encounter loses its consensual nature and falls into one of the next two Supreme Court categories. . . .
 {¶ 12} "The second type of encounter is a `Terry stop' or an investigatory detention. The investigatory detention is more intrusive than a consensual encounter, but less intrusive than a formal custodial arrest. The investigatory detention is limited in duration and purpose and can only last as long as it takes a police officer to confirm or dispel his suspicions. A person is seized under this category when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority a reasonable person would have believed that he was not free to leave or is compelled to respond to questions."
 {¶ 13} In Florida v. Royer (1983), 460 U.S. 491,103 S.Ct. 1319, 75 L.Ed.2d 229, the Supreme Court held that the minimal intrusion of the simple questioning of a person not in custody does not constitute a "seizure" requiring Fourth Amendment protection. Specifically, the court in Royer stated:
 {¶ 14} "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." Id. at 497, 103 S.Ct. at 1324, 75 L.Ed.2d at 236.
 {¶ 15} The facts in this matter bear little resemblance to the facts in State v. Ford (2002), 149 Ohio App.3d 676, upon which the trial court relied. In Ford, the trial court accepted the version of the police encounter testified to by a neutral witness. Susan Estes testified as follows in Ford:
 {¶ 16} "The police came real fast up in the thing and before they even stopped, the officer on the passenger side had his door open ready to get out. He said, come here. He already stopped and they jumped out and grabbed him. And the other officer came around, he grabbed him and handcuffed him and searched him. They found a big knife on him. They put him up against the car and they searched him again, then they put him in the car."
 {¶ 17} Estes testified that she did not hear the officer ask Ford whether he minded whether they had a conversation. She also testified that she "could hear exactly what the exchange was between the officers and the defendant."
 {¶ 18} In finding that Ford's interaction with the police officers was not a consensual encounter, the trial court made the following observations:
 {¶ 19} "In this case, driving the cruiser off the roadway, over the curb, across walkways and into the grass lead this Court to conclude this was clearly not a consensual encounter. The officers were `determined' to stop this Defendant because `it was a little suspicious, he kept looking over his shoulder at us.' (Tr. pg. 16 line 20-21)."
 {¶ 20} "Officer Emerson testified their maneuver is one they use often while patrolling on bicycles. However, there's a clear distinction between a mountain bike and a one [sic] ton police cruiser. Any reasonable citizen would feel intimidated if police pursue him in a cruiser by driving over a curb and sidewalks. In this case, by both physical force and show of authority the defendant's liberty was restrained, leading a reasonable person to feel he was not free to decline the officers' request or otherwise terminate the encounter.
 {¶ 21} "In fact, Ms. Estes' account of the incident reveals the defendant had no opportunity to decline the encounter."
 {¶ 22} In a motion to suppress, a trial court assumes the role of the trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of the witnesses.State v. Retherford (1994), 93 Ohio App.3d 586, 592,639 N.E.2d 498. Accordingly, in reviewing a motion to suppress, an appellate court is to give broad deference to the trial court's findings of fact if they are supported by competent, credible evidence. Id. However, an appellate court conducts a de novo review of whether the facts meet the appropriate legal standard in any given case.Ornelas v. United States (1996), 517 U.S. 690, 116 S.Ct. 1657,134 L.Ed.2d 911; Retherford, supra.
 {¶ 23} We believe the initial encounter that the police officers had with Smith was a consensual encounter. The request to examine one's identification does not make an encounter nonconsensual. Florida v. Rodriguez (1984), 469 U.S. 1, 4-6,105 S.Ct. 308, 83 L.Ed.2d 165. State v. Taylor, supra. Once Officer Kramer learned that a Richard R. Smith with a birth date one year different than Smith's was the subject of a capias warrant he had reasonable grounds to detain Smith further to resolve the discrepancy. When Smith then could not remember his date of birth and could not produce an ID, Officer Kramer acted reasonably when he informed Smith he would be transported to the jail to be fingerprinted to resolve the matter of his identity. When Smith then produced his ID card which confirmed that he was wanted on the capias warrant, the police had probable cause to arrest him and search him incident to that arrest. The trial court erred in granting Smith's suppression motion. The State's assignment of error is sustained.
 {¶ 24} The judgment of the trial court is Reversed and Remanded for further proceedings.
Wolff, J., and Grady, J., concur.